1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BENJAMIN SHIRLEY,

Plaintiff,

-against-

CITY OF NEW YORK, THOMAS LEE,
EUGENE CHOI, KEVIN CAMERON,
THOMAS SJOBERG, KEITH GUZZETTA,
NICHOLAS GRAZIANO,

Defendants.

Case No: 23-cv-9696

COMPLAINT

PLAINTIFF DEMANDS A
TRIAL BY JURY

Plaintiff, appearing by his attorneys, FARUQI & FARUQI, LLP and Roth & Roth LLP, hereby alleges against defendants as follows:

## I. Preliminary Statement

1.     The plaintiff, Dr. Benjaim Shirley, DDS, is a Black man and the owner of Benjamin Shirley DDS, P.C., which operated under the name "Upper West Side Dental" on the ground floor of 992 Columbus Avenue, New York, 10025.

2.     Dr. Shirley's business, Upper West Side Dental, offers late night hours to accommodate busy New Yorkers who can't make daytime appointments.

3.     On March 9, 2020, just after midnight, Dr. Shirley was doing lab work and taking out the trash. Defendant NYPD officers THOMAS LEE and EUGENE CHOI saw Dr. Shirley take out the trash and then reenter the front door to this office.

4.     The officers racially profiled Dr. Shirley because he was a Black man. They immediately approached the front door to his office, knocked and rang the bell,

and refused to leave until Dr. Shirley came to the door. They would have never treated a white doctor that way.

5.     Plaintiff brings this civil rights action for compensatory and punitive damages to redress the deprivation, under color of state law, of rights secured to him under the First, Fourth and Fourteenth Amendments of the United States Constitution, and pursuant to New York City Administrative Code § 8-803(b).

## II. Jurisdiction

6.     Jurisdiction is conferred upon this Court by 28 U.S.C. §1343, which provides for original jurisdiction over all actions brought pursuant to 42 U.S.C. §1983, by 28 U.S.C. §1331, which provides jurisdiction over all cases brought pursuant to the Constitution and laws of the United States. The Court has pendent jurisdiction over plaintiff's New York City Administrative Code § 8-803(b) claims pursuant to 28 U.S.C. §1367.

## III. Parties

7.     Plaintiff Dr. Benjamin Shirley resides in the City and State of New York.

8.     Defendant City of New York ("City") is a municipal corporation, incorporated pursuant to the laws of the State of New York.

9.     Defendant CITY maintains the New York Police Department ("NYPD"), a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York

3

State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, City of New York.

10.    Defendants THOMAS LEE, EUGENE CHOI, KEVIN CAMERON, and THOMAS SJOBERG, KEITH GUZZETTA, NICHOLAS GRAZIANO (the "Defendant POLICE OFFICERS") were at all times relevant to this complaint, duly sworn police officers of the NYPD, and were acting under the supervision of the NYPD and according to their official duties. Plaintiff asserts his claims against Officers LEE, CHOI, CAMERON, SJOBERG, in both their official and individual capacities.

11.    At all times relevant herein, the Defendant POLICE OFFICERS either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

12.    Each and all of the acts of the Defendant POLICE OFFICERS alleged herein were done by said Defendants while acting within the course and scope of their duties and functions as agents, servants, employees and officers of the Defendant CITY.

13.    Each and all of the acts of the Defendant POLICE OFFICERS alleged herein were done by said defendants while acting in furtherance of their employment by Defendant CITY.

4

## IV. Facts

14.     On the evening of March 8, 2020 into the early morning of March 9, 2020 Plaintiff was lawfully present inside of his dental office at the Premises.

15.     On the evening of March 8, 2020 into the early morning of March 9, 2020 Defendants THOMAS LEE and EUGENE CHOI, were on duty in the vicinity of the Premises.

16.     On the evening of March 8, 2020 into the early morning of March 9, 2020 Plaintiff, while lawfully present inside of his dental office at the Premises, exited to discard the office's trash in the area designated by the building's landlord.

17.     While discarding the trash, Plaintiff was lawfully upon the sidewalks abutting the Premises.

18.     Plaintiff reentered the Premises with the use of the keys.

19.     Defendants THOMAS LEE and EUGENE CHOI observed Plaintiff reenter the premises using his keys.

20.     Defendants THOMAS LEE and EUGENE CHOI without justification, reasonable suspicion, or probable cause, approached the ground-floor windows of the Premises and began shining their lights inside and onto the Plaintiff.

21.     Defendants THOMAS LEE and EUGENE CHOI without justification, reasonable suspicion, or probable cause, accessed the Premises' intercom system to summon Plaintiff.

5

22.     Defendants THOMAS LEE and EUGENE CHOI voluntarily approached, stopped, questioned, and detained Plaintiff without justification, reasonable suspicion, probable cause, or founded suspicion that criminal activity was afoot.

23.     Defendants THOMAS LEE and EUGENE CHOI demanded that Plaintiff exit the Premises and show identification without justification, reasonable suspicion, or probable cause.

24.     Defendants THOMAS LEE and EUGENE CHOI later admitted that they did not have any reasonable suspicion or probable cause to demand that Plaintiff exit his lawful place of business.

25.     Defendants THOMAS LEE and EUGENE CHOI later admitted that they did not have any reasonable suspicion or probable cause to believe that Plaintiff was not lawfully present in the Premises.

26.     Defendants THOMAS LEE and EUGENE CHOI began issuing demands to Plaintiff in a threatening manner and shining their NYPD issued flashlights in his face, temporarily blinding, and disorienting him.

27.     Defendants caused Plaintiff to fear for his life, including fearing that the officers would shoot him.

6

28.     Plaintiff called 911, operated by the CITY OF NEW YORK for help.

29.     The 911 dispatcher, an agent, servant, and employee of the Defendant CITY OF NEW YORK refused to help Plaintiff.

30.     Plaintiff identified himself as a Black man and specifically stated that he believed he was being harassed because of his race.

31.     The 911 dispatcher admonished Plaintiff and talked down to him.

32.     The 911 dispatcher put Plaintiff on hold before getting his address and then disconnected him.

33.     The 911 dispatcher called the NYPD's IAB and was connected to Defendant GUZZETTA.

34.     The 911 dispatcher and GUZZETTA teased and made fun of the Plaintiff because of his distress and fear.

35.     The 911 dispatcher and GUZZETTA assumed that Plaintiff was not in any danger despite establishing that no NYPD officers had indicated that they were lawfully present at the Premises.

36.     The 911 dispatcher and GUZZETTA assumed that the individuals

harassing Plaintiff were police officers acting within the scope of the law despite the fact that IAB is tasked with responding to police impersonators.

37.     The 911 dispatcher and GUZZETTA stated that Plaintiff should be harassed by Police for working late in his office.

38.     KEVIN CAMERON, and THOMAS SJOBERG were dispatched to the general area over the radio after the Plaintiff called 911.

39.     Upon hearing that IAB requested the patrol Sergeant to the general area because a caller stated he was being harassed by the NYPD, THOMAS LEE and EUGENE CHOI, for the first time, provided their location to the NYPD dispatcher.

40.     Upon information and belief, THOMAS LEE, EUGENE CHOI, KEVIN CAMERON, and THOMAS SJOBERG began messaging and calling each other using both their personal and NYPD issued cellular phones.

41.     Upon information and belief, THOMAS LEE, EUGENE CHOI, KEVIN CAMERON, and THOMAS SJOBERG conspired to unlawfully continue harassing Plaintiff to justify the NYPD presence at the Premises and the officers' prior actions.

42.     Upon information and belief, THOMAS LEE, EUGENE CHOI,

KEVIN CAMERON, and THOMAS SJOBERG planned and conspired to arrest Plaintiff to justify their actions in any NYPD investigation.

43.     Upon information and belief, THOMAS LEE, EUGENE CHOI, KEVIN CAMERON, and THOMAS SJOBERG assumed that Plaintiff would not be able to produce government issued identification that he was lawfully present upon the Premises.

44.     Upon information and belief, THOMAS LEE, EUGENE CHOI, KEVIN CAMERON, and THOMAS SJOBERG intended to falsely arrest Plaintiff for a crime.

45.     Upon information and belief, THOMAS LEE, EUGENE CHOI, KEVIN CAMERON, and THOMAS SJOBERG harassed and abused Plaintiff with the intention to induce Plaintiff to act in a disorderly manner that they could falsely claim was a violation of the New York State Penal Law in order to justify their actions.

46.     Upon information and belief, THOMAS LEE, EUGENE CHOI, KEVIN CAMERON, and THOMAS SJOBERG assumed that because Plaintiff was Black, he would act in a disorderly, aggressive, and violent manner when confronted with their unlawful behavior, and that they could use that to justify their actions.

47.    Defendants    THOMAS    LEE,    EUGENE    CHOI,    KEVIN
CAMERON,    and THOMAS SJOBERG repeatedly demanded that Plaintiff exit the
Premises, despite knowing it was unlawful to do so.

48.    Defendants    THOMAS    LEE,    EUGENE    CHOI,    KEVIN
CAMERON,    and THOMAS SJOBERG repeatedly threatened to destroy Plaintiff's
security equipment, business, and appurtenances unless Plaintiff exited the
Premises, despite knowing it was unlawful to do so.

49.    Defendants    THOMAS    LEE,    EUGENE    CHOI,    KEVIN
CAMERON,    and THOMAS SJOBERG repeatedly demanded that Plaintiff show
his identification as proof of his lawful presence on the Premises, despite knowing it
was unlawful to do so.

50.    Defendants    THOMAS    LEE,    EUGENE    CHOI,    KEVIN
CAMERON,    and THOMAS SJOBERG repeatedly claimed that they needed to
verify Plaintiff's identity despite  knowing it was unlawful to do so.

51.    Defendants    THOMAS    LEE,    EUGENE    CHOI,    KEVIN
CAMERON,  and THOMAS SJOBERG, shone their flashlights in Plaintiff's face,
temporarily blinding and/or disorientating Plaintiff, despite knowing it was
unlawful to do so under the circumstances.

52.     Defendants     THOMAS     LEE,     EUGENE     CHOI,     KEVIN CAMERON,    and THOMAS SJOBERG held Plaintiff hostage in his office and restrained his movement against his will without his consent.

53.     Defendants     THOMAS     LEE,     EUGENE     CHOI,     KEVIN CAMERON,    and THOMAS SJOBERG acted with the intent to cause Plaintiff apprehension.

54.     Defendants     THOMAS     LEE,     EUGENE     CHOI,     KEVIN CAMERON,   and THOMAS SJOBERG caused Plaintiff apprehension.

55.     Defendants     THOMAS     LEE,     EUGENE     CHOI,     KEVIN CAMERON,    and THOMAS SJOBERG forced Plaintiff to exit his building under threat that they would destroy his property if he did not abide by their commands.

56.     Defendants forced Plaintiff to hand them his identification multiple times.

57.     Defendant EUGENE CHOI took a photograph of Plaintiff's identification on his cellular phone without any justification for doing so.

58.     Defendants     THOMAS     LEE,     EUGENE     CHOI,     KEVIN CAMERON,   and THOMAS SJOBERG conspired to ensure that their actions were not properly investigated.

11

59.     Defendants   THOMAS    LEE,   EUGENE   CHOI,   KEVIN CAMERON,  and THOMAS SJOBERG signaled to each other to turn on and off their Body Worn Cameras [hereinafter "BWCs].

60.     Defendants   THOMAS    LEE,   EUGENE   CHOI,   KEVIN CAMERON,  and THOMAS SJOBERG refused to turn on their BWCs until the end of the encounter in violation of a prior Court order that these types of encounters must be recorded.

61.     Defendants   THOMAS    LEE,   EUGENE   CHOI,   KEVIN CAMERON,  and THOMAS SJOBERG refused to turn on their BWCs until the end of the encounter in violation of NYPD policy.

62.     Upon information and THOMAS LEE, EUGENE CHOI, KEVIN CAMERON, and THOMAS SJOBERG conspired between themselves and with other officers to ensure that their actions were not properly investigated.

63.     Upon information and THOMAS LEE, EUGENE CHOI, KEVIN CAMERON, and THOMAS SJOBERG conspired between themselves and with other officers, including, but not limited to KEITH GUZZETTA and NICHOLAS GRAZIANO to ensure that their actions were not properly investigated.

64.     Defendants   THOMAS    LEE,   EUGENE   CHOI,   KEVIN

CAMERON,   and THOMAS SJOBERG caused Plaintiff to be concerned that he was about to suffer harmful and/or offensive bodily contact and/or to fear same.

65.     Defendants   THOMAS   LEE,   EUGENE   CHOI,   KEVIN CAMERON,   and THOMAS SJOBERG's conduct was offensive and without justification.

66.     Defendants THOMAS LEE, EUGENE CHOI,  KEVIN  CAMERON, and THOMAS SJOBERG's conduct was done with the intent to harm and/or harass Plaintiff.

67.     The aforesaid occurrence and resultant injuries to the Plaintiff, were caused solely and wholly by reason of the intentional acts of Defendants THOMAS LEE, EUGENE CHOI, KEVIN CAMERON, and THOMAS SJOBERG.

## V. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### FALSE ARREST UNDER 42 U.S.C. § 1983

68.     Plaintiff re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

69.     On March 9, 2020 Defendants THOMAS LEE, EUGENE CHOI, KEVIN CAMERON, and THOMAS SJOBERG, intended to confine Plaintiff.

70.     Plaintiff was aware of the confinement.

71.   Plaintiff did not consent to the confinement.

72.   Plaintiff's confinement was not otherwise privileged.

73.   This arrest was made in the absence of a warrant for the arrest.

74.   This arrest was made in the absence of probable cause for this arrest.

75.   The Defendant POLICE OFFICERS arrested plaintiff without having exigent circumstances for doing so.

76.   There was no other authority for the arrest of plaintiff.

77.   As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer economic injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, economic damages, legal expenses and damages to his reputation and standing within his community.

## SECOND CLAIM FOR RELIEF
## FAILURE TO INTERVENE UNDER 42 U.S.C. § 1983

78.   Plaintiff re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

79.   As law enforcement officers, each of the individual Defendants had a duty to intervene to prevent the stop, seizure, false imprisonment, assault, battery, and Constitutional violations suffered by Plaintiff at the hands of their fellow officers.

80.   On the evening of March 9, 2020, Defendants THOMAS LEE, EUGENE CHOI, KEVIN CAMERON, and THOMAS SJOBERG, each had the duty to intervene to prevent the violations suffered upon Plaintiff by their fellow officers.

81.     On the evening of March 9, 2020, and continuing thereafter, Defendants KEITH GUZZETTA and NICHOLAS GRAZIANO each had the duty to intervene to prevent the violations suffered upon Plaintiff by their fellow officers.

82.     On the evening of March 9, 2020, Defendant KEITH GUZZETTA was assigned to respond to Plaintiff's 911 emergency call.

83.     On the evening of March 9, 2020, Defendant KEITH GUZZETTA assumed that Plaintiff was not entitled to be inside of his own dental practice without even speaking to Plaintiff.

84.     On the evening of March 9, 2020, Defendant KEITH GUZZETTA and an unknown 911 operator, employed by Defendant CITY OF NEW YORK, mocked, and made fun of Plaintiff for calling 911.

85.     Instead of responding to the call, Defendant KEITH GUZZETTA sent the Defendants KEVIN CAMERON, and THOMAS SJOBERG.

86.     On the evening of March 9, 2020, and continuing thereafter, Defendants KEITH GUZZETTA and NICHOLAS GRAZIANO failed to respond to the unlawful acts of their fellow officers that were in progress.

87.     Defendants all had the reasonable opportunity to intervene but failed to do so.

88.     As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer economic injuries, violation of his civil rights,

emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, economic damages, legal expenses and damages to his reputation and standing within his community.

89.     As a result of the above unconstitutional conduct, the Individual Defendants are liable for punitive damages.

### THIRD CLAIM FOR RELIEF
*Monell* liability pursuant to 42 U.S.C. § 1983
against the CITY OF NEW YORK

90.     All preceding and subsequent paragraphs are incorporated by reference.

91.     The Individual Defendants and their fellow officers, agents, and employees of the CITY OF NEW YORK, were acting under color of state law at all relevant times.

92.     On the evening of May 14, 2018 and the evening of March 8, 2020 into the early morning of March 9, 2020, Plaintiff was lawfully present at the Premises.

93.     On the evening of March 8, 2020 into the early morning of March 9, 2020, Plaintiff was lawfully present on the sidewalks abutting the Premises.

94.     In the early morning hours of March 9, 2020 Plaintiff was lawfully present inside of the Premises when he was stopped, questioned, seized, imprisoned, assaulted, and subjected to the violation of his Constitutional rights based solely on the basis of his race.

95.    During the aforementioned incidents, the Individual Officers had no probable cause, reasonable suspicion, justification, or authority to act in the manner that they did.

96.    The actions and inactions of the Individual Defendants were unlawful.

97.    The actions and inactions of the Individual Defendants violated the Constitutional rights of the Plaintiff.

98.    The actions of the Individual Defendants were the result of the CITY OF NEW YORK's deliberate indifference to the rights of its Black citizens, including the Plaintiff.

99.    The actions of the Individual Defendants were part of the CITY OF NEW YORK's custom and/or practice of racial profiling, and/or meeting arrest or summons quotas, and/or the illegal stop and search of civilians which was authorized by, or met with the tacit approval of the CITY OF NEW YORK under the NYPD's "Stop, Question and Frisk" policy or program [hereinafter as "Stop and Frisk"] and its Trespass Affidavit policy or program [hereinafter as "TAP"].

100.    Under Stop and Frisk and TAP, the CITY OF NEW YORK permitted, condoned and/or acted with deliberate indifference to the rights of its citizens.

101.    CITY OF NEW YORK permitted, condoned and/or acted with deliberate indifference to the racial disparities in the application of Stop and Frisk and TAP.

102.    CITY OF NEW YORK permitted, condoned and/or acted with

deliberate indifference to fact that many illegal searches, stops, and seizures were conducted, that very low percentages of seizures, frisks, and searches resulted in arrests or the recovery of contraband, that pretextual reasons are provided for the Stop and Frisk or TAP stop, that officers do not always fill out Stop and Frisk reports and other paperwork, that the paperwork filled out does not make sense legally or factually, that officers are not disciplined when they fail to fill out paperwork or when their paperwork does not make sense, does not support a legal stop, and/or is contradicted by evidence, that Stop and Frisks are conducted without reasonable suspicion or any justification, that Stop and Frisks and TAP stops were being unlawfully conducted in private homes, dwellings, and businesses without any legal or factual justification, that Stop and Frisks and TAP stops that resulted in arrests were found to be legally insufficient in court and/or were found to be defective, deficient, or otherwise unlawful by the District Attorneys' offices who dismissed or declined to prosecute same.

103.   The CITY OF NEW YORK was informed by the New York State Attorney General in a 1999 report, that:

a.      at least 15% of the 15,000 Stop and Frisks analyzed were unlawful.

b.      "blacks and Hispanics were significantly more likely than whites to be 'stopped' [even] after controlling for race-specific precinct crime rates and precinct population composition by race."

c.      Different crime rates among precincts did not explain the higher

overall stop rate in majority-minority precincts as opposed to majority-white precincts.

104.    The CITY OF NEW YORK through the NYPD rejected the findings of the 1999 Attorney General's report.

105.    The 1999 Attorney General's report findings were credited in <u>Floyd v. City of N.Y.</u>, 959 F. Supp. 2d 540, 596 (S.D.N.Y. 2013).

106.    The CITY OF NEW YORK, failed for years, and continues to fail to discipline, train, monitor, retrain, and/or terminate offending police officers who engaged in stops without sufficient legal justification.

107.    "Paying the rent" and "activity" are terms for "productivity targets" set by the NYPD.

108.    The "productivity targets" are arrest and/or summons quotas.

109.    The existence of arrest quotas is well documented including in sworn testimony and recordings by NYPD officers and cited by Justice Sheindlin in <u>Floyd v. City of N.Y.</u>, 959 F. Supp. 2d 540, 596 (S.D.N.Y. 2013).

110.    Arrest and summons quotas are used by the NYPD as proof that the officer is doing their job and is worthy of being promoted, praised, or given preferential assignments and tasks, regardless of whether the instruments were used lawfully.

111.    Officers who do not meet quotas are assigned to "punishment posts".

112.    Justice Sheindlin in <u>Floyd v. City of N.Y.</u>, 959 F. Supp. 2d 540, 596 (S.D.N.Y. 2013) held that "No rewards or punishments turned on the quality of stops conducted. Indeed, when officers were found to have made "bad" stops, little or no discipline was imposed. The evidence showed that the NYPD turned a blind eye to its duty to monitor and supervise the constitutionality of the stops and frisks conducted by its officers."

113.    Despite a Court Order to implement and use BWCs, the NYPD has failed to provide proper oversight of the program to ensure that BWCs are worn and engaged appropriately.

114.    The CITY OF NEW YORK, failed for years, and continues to fail to discipline, train, monitor, retrain, and/or terminate offending police officers who made false representations on NYPD paperwork and/or in affidavits submitted to the District Attorney and/or the court.

115.    The CITY OF NEW YORK, failed for years, and continues to fail to discipline, train, monitor, retrain, and/or terminate offending police officers who have been found by courts to have been not credible in their sworn testimony, despite the fact that the CITY OF NEW YORK through its District Attorney's offices maintains lists of said officers.

116.    The CITY OF NEW YORK, failed for years, and continues to fail to discipline, train, monitor, retrain, and/or terminate offending police officers who have been found committing integrity violations, for example, using their NYPD parking

plaques to illegally park on personal business, refusing to show up to Court to testify when a fellow officer's family or friend is the recipient of a summons or ticket and "testilying."

117.    The CITY OF NEW YORK, failed for years, and continues to fail to discipline, train, monitor, retrain, and/or terminate offending police officers who retaliate against other officers who report police misconduct.

118.    The CITY OF NEW YORK, failed for years, and continues to fail to discipline, train, monitor, retrain, and/or terminate offending police officers who retaliate against other officers who follow the law and internal NYPD guidelines.

119.    Any NYPD officer who attempts to follow the letter of the law is known by the term "shake box" which is derogatory term used throughout the NYPD.

120.    The CITY OF NEW YORK, failed for years, and continues to fail to overhaul, manage, supervise, and correct the defective internal disciplinary system of the NYPD including the Chief-of-Department and Internal Affairs Bureaus.

121.    The CITY OF NEW YORK, failed for years, and continues to fail to appropriately select members of its internal disciplinary system, including IAB.

122.    Most IAB officers are "drafted" into IAB and did not choose the assignment.

123.    IAB is commonly referred to as "the rat squad."

124.    "The rat squad" is a derogatory term used throughout the NYPD to

indicate that IAB investigators "rat" on their fellow officers.

125.    Many IAB officers do not want to, are not willing to, and do not effectively investigate their fellow officers.

126.    The Chief of Department and Internal Affairs Bureaus frequently fail to adequately investigate and/or punish offending officers.

127.    The NYPD is plagued with nepotism.

128.    NYPD officers who have a "hook" and/or a "rabbi" in the department are often promoted and transferred to favorable positions and assignments despite their histories of violence, corruption, and/or integrity, disciplinary, and ethical violations.

129.    NYPD officers with a "hook" and/or a "rabbi" are often white males with family members currently in and/or who are former NYPD.

130.    The 24th Pct. is located within Manhattan's Upper West Side [hereinafter "the UWS"] neighborhood.

131.    The UWS is policed primarily by the NYPD's 24th and 20th precincts.

132.    The UWS is an affluent and primarily residential area.

133.    In 2018, New York University's Furman Center determined that 68.4% of UWS residents identified as white, 14.1% identified as Hispanic, 10.8% identified as Asian, and 4.1% identified as Black.

134.    The 2020 NYPD Enforcement Report admitted that the majority of NYPD uniformed officers were white.

135.    The 2020 NYPD Enforcement Report admitted that Black individuals were the most frequent racial group subjected to Stop, Question, and Frisk [hereinafter as "SQF"] by NYPD officers.

136.    The 2020 NYPD Enforcement Report stated that 56.6% of all individuals subjected to SQF by NYPD were Black.

137.    To date, NYPD has refused to release the 2020 SQF statistics to the public at large.

138.    To date, NYPD has refused to disclose the 2020 SQF data to the undersigned despite a lawful request pursuant to the Public Officers' Law of the State of New York.

139.    The NYPD's SQF data contains three initiation types: "Based on Radio Run," "Based on C/W on Scene," and "Based on Self-Initiated."

140.    "Based on Radio Run" means that the officer alleged that they were making a SQF stop based on the description of a perpetrator provided over the police radio.

141.    "Based on C/W on Scene" means that the officer alleged that they were making a SQF stop based on the description of a perpetrator provided by a complaining witness.

142.    "Based on Self-Initiated" [hereinafter as "Self-Initiated SQF"] means that officer alleged that the SQF stop was made on the basis of their own observations.

143.    In 2018, the NYPD through its law enforcement officers, recorded 11,008 stops made pursuant to SQF.

144.    In 2018, the NYPD recorded 158 stops made pursuant to SQF by officers then assigned to the 24th Precinct.

145.    In 2018, the NYPD recorded 27 Self-Initiated SQF stops by officers then assigned to the 24th Precinct.

146.    Two (2) of the individuals stopped by the 24th Pct. in the reported 2018 Self- Initiated SQF stops were white.

147.    None of the individuals stopped by the 24th Pct. in the reported 2018 Self-Initiated SQF stops were Asian.

148.    Twenty-two (22) of the individuals stopped by the 24th Pct. in the reported 2018 Self-Initiated SQF stops were Black, including Black Hispanic, and the remainder were White Hispanic.

149.    Three (3) of the individuals stopped by the 24th Pct. in the reported 2018 Self- Initiated SQF stops were White Hispanic.

150.    In 2019, the NYPD through its law enforcement officers, recorded 13,459 stops made pursuant to SQF.

151.    In 2019, the NYPD recorded 147 stops made pursuant to SQF by officers then assigned to the 24th Precinct.

152.    In 2019, the NYPD recorded 19 Self-Initiated SQF stops by officers then assigned to the 24th Precinct.

153.    None of the individuals stopped by the 24th Pct. in the reported 2019 Self-Initiated SQF stops were white.

154.    None of the individuals stopped by the 24th Pct. in the reported 2019 Self-Initiated SQF stops were Asian.

155.    More than 73% of the individuals stopped by the 24th Pct. in the reported 2019 Self-Initiated SQF stops were Black, including Black Hispanic and the remainder were White Hispanic.

156.    The 2018 and 2019 SQF data released by NYPD contains obvious errors, including stops that officers claimed lasted for zero minutes, inappropriate responses to questions, chasing suspects without reasonable suspicion and in violation of Debour and the Patrol Guide, and multiple self-initiated stops conducted in private residences.

157.    In Floyd v. City of New York, 283 F.R.D. 153 (S.D.N.Y. 2013), it was held that the CITY OF NEW YORK through the NYPD, its agents, servants, and employees, violated the rights of numerous Black men through its policy and procedure of increasing SQF stops since 2004.

158.    The remedial order in Floyd v. City of New York, 959 F. Supp. 2d 668 (S.D.N.Y. 2013) [hereinafter "Remedial Floyd Order"] mandated the involvement of a court-appointed monitor [hereinafter "Federal Monitor"] to establish policies and procedures for NYPD's BWC program. Id.

159.    The November 30, 2020, Twelfth Report of the Independent Monitor,

found "When BWCs are being used, the officers know that there are extra sets of eyes on their actions, and therefore a failure to file a stop report when required is much more likely to be discovered. So what could be expected is an increase in the number of stop reports for encounters that may be problematic. That is in fact what happened. There was a meaningful increase in the number of stop reports filed by officers wearing BWC."

160.    The illegal and unlawful stops, seizures, and Constitutional violations suffered by Plaintiff were caused solely, and wholly, by the CITY OF NEW YORK's policy, custom, and/or practice of allowing for, encouraging, and failing to discipline, the racial profiling of Black citizens, the arrest and/or summons and/or productivity quotas, and the rampant misconduct and/or illegal activities of its police force.

161.    The CITY OF NEW YORK's policies, customs, and practices violated Plaintiff's Fourth Amendment and Fourteenth Amendment rights.

162.    As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer economic injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, economic damages, legal expenses and damages to his reputation and standing within his community.

163.    As a result of the above unconstitutional conduct, the Individual Defendants are liable for punitive damages.

26

## FOURTH CLAIM FOR RELIEF

### (N.Y.C Admin. Code §§ 8-801 to 8-807; All Defendants)

164.    All preceding and subsequent paragraphs are incorporated by reference.

165.    By the actions described above, each and all of the Defendants, jointly and severally, acting in concert with each other and with additional persons for whose acts they are liable, initiated, continued and/or caused the unlawful stop, seizure and arrest of plaintiff.

166.    Despite knowing that reasonable suspicion and/or probable cause did not exist to stop, seize or arrest Dr. Shirley, Defendants intentionally, recklessly, and with malice stopped, seized and arrested Dr. Shirley.

167.    Defendants stopped, seized and arrested Dr. Shirley solely based on the color of his skin.

168.    The City of New York is liable as the employer of the Individual Defendants under New York City Administrative Code § 8-803(b).

169.    Qualified immunity is no defense to this claim.

170.    As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer economic injuries, violation of civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, economic damages, legal expenses and damage to his reputation and standing within his community.

27

171.    As a result of the above unconstitutional conduct, the Individual

Defendants are liable for punitive damages.

**WHEREFORE,** Plaintiff respectfully requests that judgment be entered for

all claims:

   i.  Awarding plaintiff full and fair compensatory damages as decided by the jury; and
  ii.  Awarding plaintiff full and fair punitive damages as decided by the jury; and
 iii.  Awarding plaintiff reasonable attorney fees pursuant to 42 U.S.C. §1988; and
 iv.  Granting such other and further relief as this Court may deem just and proper.

Dated:     New York, New York
           November 2, 2023

                       FARUQI & FARUQI, LLP

                          ~//s//~

                       _____
                       Reza Rezvani, RR6192
                       *Co-counsel for plaintiff*
                       685 Third Avenue, 26th
                       Floor New York, New York
                       10017 Tel: (212) 983-9330
                       nyctriallawyer@gmail.com

                       ROTH & ROTH, LLP

                         ~//s//~

                       _____
                       Elliot D. Shields, ED3372
                       *Co-counsel for plaintiff*
                       192 Lexington Ave., Suite 802
                       New York, New York 10016
                       212-425-1020
                       eshields@rothandrothlaw.com